**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  21-320 (ABJ)** |
| | ) | |
| v. | ) | |
| | ) | |
| **JEREMY SORVISTO** | ) | |
| | ) | |
| | ) | |

---

**MEMORANDUM IN AID OF SENTENCING**

*Where all think alike, no one thinks very much.*

*Walter Lippmann*

1

It was a cold afternoon in Hancock, Michigan on January 4th.  Jeremy Sorvisto and his friends were heading on a road trip south to Georgia on a long-planned vacation to see family and friends.  That afternoon, he cleaned the house, packed his bags, and along with his newly minted fiancé, left their place to meet with Karl Dresch and his wife for the road trip.  Mr. Dresch and his wife rented a Dodge Charger.  Mr. Sorvisto and his fiancé, rode in the backseat, hats and mittens on, ready to escape the cold.

Mr. Sorvisto was looking forward to this trip south.  Georgia was expected to be in the mid-50s, balmy to compared the recent 7-degree temperature and snow in Michigan.  They planned to stop in Ohio, then to Virginia to visit his fiancé's family before finally reaching Georgia.  The topic of the "Trump rally" on January 6th had come up.  It was Mr. Dresch's plan to stop in D.C. all along.  The others agreed.  If Mr. Dresch did not want to go, the group would have proceeded with the trip as planned.  When they arrived in Virginia on the evening of January 5th, no one expected violence the next day.  No one planned to participate in a riot on January 6th.  Mr. Sorvisto thought that peaceful protests happen in D.C. regularly, so January 6th would be no different.

On the morning of January 6th, Mr. Sorvisto and Mr. Dresch obtained a ride to the Capitol.  Mr. Sorvisto's fiancé wanted to attend, but the men wanted their partners to stay behind at the hotel.  They arrived at the U.S. Capitol to hear former President Trump speak.  Along with hundreds of others, he and Mr. Dresch entered the Capitol.  Mr. Sorvisto did not assault an officer or engage in any violence.  He took pictures of himself and sent them to his fiancé.  At some point, uniformed Capitol police officers informed a crowd that there had been a shooting and directed the group to leave the building.

The decision to stop by the rally was not unique to Mr. Sorvisto and his friends. Hundreds attended the "Save America" rally[1], which then-President Donald Trump announced on December 19, 2020, following his loss in the 2020 presidential election.  The rally was set for the same date Congress was set to certify Joe Biden as the winner.  On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[3] Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son,

---

[1]      President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

[2]      Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3]      *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4]      *Id*.

[5]      *Id*.

encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching."[7]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10]  At approximately 12:50

---

[6]      *Id*.

[7]      *Id*.

[8]      *Id*.

[9]      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]     *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11]  The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12]  The MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West.  However, the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol.  By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building.  Officers were able to hold off the motivated crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building.  This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Following the building's breach, Mr. Sorvisto and Mr. Dresch entered the Capitol through the Senate West Wing doors.  They were told to leave by officers after a shooting. As they proceeded to the exit, another wave of individuals were present and things became very

---

[11]     *Id*.

[12]     *Id*.

[13]     *Id*.

[14]     *Id*.

chaotic.  Mr. Sorvisto told law enforcement[15] recently that people were rowdy and furniture flew

past their heads.  Therefore, he and Mr. Dresch immediately fled through a window.  They took

the metro to the station closest to their hotel in Virginia and hailed a ride to the hotel from there.

Mr. Sorvisto, Mr. Dresch, and their partners continued on their planned trip south to Georgia.

## PROCEDURAL HISTORY

Approximately three months later on April 5, 2021, a criminal complaint was filed in

U.S. District Court for the District of Columbia charging Mr. Sorvisto with four misdemeanor

offenses.  *See* ECF No. 1.  On April 7, 2021, FBI agents arrested Mr. Sorvisto.  *See* ECF No. 5.

On April 13, 2021, Mr. Sorvisto had his initial appearance in U.S. District Court and was

released on his personal recognizance with conditions.  *See* ECF No. 8.  An information was then

filed on April 26, 2021, formally alleging the charges of (i) Entering and Remaining in a

Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive

Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and

Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv)

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §

5104(e)(2)(G).  *See* ECF No. 9.  On September 3, 2021, Mr. Sorvisto pled guilty to Count Four

of the Information.

## SENTENCING REQUESTS

On December 8, 2021, the government submitted its sentencing memorandum asking the

Court to impose a sentence of 30 days of incarceration and $500 in restitution.  *See* ECF No. 28.

Mr. Sorvisto requests that this Honorable Court sentence him to two years of probation and $500

in restitution, which is fair and reasonable, based on the nature and circumstances of the offense,

---

[15] Mr. Sorvisto spoke with the FBI as a condition of his plea agreement.

his background, his acceptance of responsibility, his conduct on pretrial release, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a).

## LEGAL PRINCIPLES

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow.  *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id*. at 2 (B-D).  Further still, the Court must be mindful of "the kinds of sentences available,"

should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

**ARGUMENT**

Mr. Sorvisto is a 38-year-old seasonally employed father with no calculable criminal history. While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration or home detention. Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive. A probationary sentence would provide adequate deterrence to Mr. Sorvisto, avoid an unwarranted sentencing disparity among his co-defendants and other January 6th defendants, and protect Mr. Sorvisto's ability to provide restitution.

## I.   Nature and Circumstances of Mr. Sorvisto's Offense

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Five individuals lost their lives.[16] And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost

---

[16]    Ashli Babbitt was killed after she refused to comply with police commands. Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd. Rosanne Boyland was crushed to death. Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6th. *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

However, Mr. Sorvisto was not the cause of January 6th, nor was he in the classification of people that caused physical harm to the Capitol or others.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[17]  Additionally, the former President, the rally's organizers and speakers, and nefarious, organized groups contributed to the chaos.  To characterize Mr. Sorvisto as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As stated above, Mr. Sorvisto, with his fiancé and friends, planned to travel to Georgia for a vacation.  Mr. Dresch wanted to go to Washington, D.C., as part of the trip.  On January 6, after hearing the former president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Dresch and Mr. Sorvisto walked with thousands of others to the Capitol building.  By the time they arrived, many of the outer barricades and bicycle racks used

---

[17]     *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

by officers to cordon off the Capitol grounds were displaced.  Mr. Sorvisto did not break any windows or forcibly enter the Capitol.  He walked through a previously breached door of the Capitol.  He took pictures of himself and sent them to his fiancé.  He dishearteningly observed trash covering the floor of the building, presumably left by the protestors who entered the building before him and tried to pick up the trash.  When the uniformed Capitol police officers instructed them to leave, Mr. Sorvisto and Mr. Dresch complied.  When furniture flew past their heads, they immediately exited through a window.

When they returned to the hotel and watched the news that evening, Mr. Sorvisto was not proud of his actions and asked his fiancé to delete the pictures and the posts she made on Facebook about the event.   The group continued on the trip to Georgia and made stops along the way to visit family members.  They returned to Hancock, Michigan approximately two weeks later.  Soon thereafter, Mr. Dresch was arrested on January 19, 2021.  The decision to prosecute Mr. Dresch appeared to center around his posts on social media about the event.  Other than a selfies of himself posted to Facebook on January 6th, Mr. Sorvisto did not post any other pictures of the event[18] and closed his Facebook account.  He was not aware that the government planned to arrest him until the FBI executed the search warrant in April.

To be clear, Mr. Sorvisto played no role in organizing the January 6th rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He did not participate in the forceful breaching of the outer barricades, nor did he participate in the

---

[18] The government contends that Mr. Sorvisto used someone else's Facebook account to post a message.  *See* ECF No. 28, p. 6.  This is speculative.  Mr. Sorvisto sent messages to his fiancé who posted the messages on Facebook.  Undersigned counsel understands that his fiancé communicated on Facebook as if she was present at the Capitol since she wanted to be there.  This is consistent with his fiancé's other comments on social media and text messages regarding the event.  See ECF No. 1-1, p. 19 ("I did post Jeremy's pics.  Deleted them real quick within 10 minutes but people seem to think I was there and threaten [sic] me…").

breaching of the inner doors or windows of the U.S. Capitol.  He did not assault or threaten law enforcement.  He did not damage any property while inside.  Instead, Mr. Sorvisto's offense conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, walking through the Capitol, and following the officers instructions to leave.  That offense conduct, and not the offense conduct of others in and around the Capitol that day, should inform this Honorable Court's sentencing determination.

The government places great weight on Mr. Sorvisto's post-January 6th conduct of asking his fiancé to delete the images and getting rid of his jacket.  These actions must be placed in their proper context.  His fiancé comments on social media could have been viewed as further stirring up the numerous comments on social media immediately after the event.  At that point, his options were to ask her to keep the posts on Facebook; post the pictures on his own Facebook account in order to remove her from the social media fire; or delete the pictures and shut down his account.  He chose the least controversial option.  Regarding the jacket, the witness interviewed by the government explained that Mr. Sorvisto regularly gives clothes to him to dispose.  Overall, there was no intent to thwart the investigation.

The government also contends that Mr. Sorvisto showed a lack of remorse and did not admit his conduct to law enforcement.  This argument defies the constitutional principles that this country is grounded upon – when arrest, a person has the right to silence and his silence should not be used against him.  Mr. Sorvisto was informed of this right at his arrest and at his Initial Appearance.  While he may not have disavowed his conduct on social media, for law enforcement to see, in his small pro-Trump community, Mr. Sorvisto renounced his actions that day.

After being guided through the legal process with counsel, Mr. Sorvisto admitted guilt and did, in fact, express remorse during the one hour meeting with law enforcement, pursuant to the plea agreement.  Mr. Sorvisto was cooperative and forthcoming, dutifully answering all questions by law enforcement.  In sum, Mr. Sorvisto has been fully cooperative and open with law enforcement, and has taken full responsibility for his actions.

## II.   **Mr. Sorvisto's History and Characteristics**

As stated above, Mr. Sorvisto disavowed his conduct among others in his community, which sought to make him a hero.  As his character witnesses stated in their letter of support, Mr. Sorvisto "refused any glory that others who practices conservative Trump idolatry wanted to hang on him."[19]   Among such pressure and temptation to belong and be hailed as a hero, disavowing Trump was no easy feat for Mr. Sorvisto.  He was adopted by the Sorvistos as a child and has not spoken to his adoptive father in years.  He has also never met his biological father. Mr. Sorvisto explained during the presentence report interview, that he found him, but his biological father never returned his calls.

Mr. Sorvisto was born in Texas and lived there until his family moved to Hancock, Michigan when he was 9 or 10 years old.  After high school, he moved to Ohio to attend college but only stayed there for one summer and moved back to Michigan.  Soon thereafter, he began a family with his high school sweetheart whom he married in 2005.  In 2013, he briefly moved to North Dakota to work on oil rigs, but moved back to Michigan to be with his family.  He and his wife later divorced amicably and share custody of their three teenage children.

Mr. Sorvisto obtained his GED in 2002.  He worked as an auto mechanic for over 10 years.  He was unemployed from January to May of this year, when he was able to obtain a

---

[19] Letter of Support, Exhibit 1 (to be filed under seal).

position as a kitchen manager, a seasonal job in which he is dedicated and works long hours. Because of his hard work, he has earned three raises this year.  He is a caring individual who has quietly helped his co-workers in need.

Mr. Sorvisto's three children are the apple of his eye.  His youngest child has medical challenges that require him to be available at a moment's notice to go to the hospital.  He looks forward to his oldest child graduating from high school next year and his middle child doing the same a year later.   In light of his need to work, provide, and care for his family, Mr. Sorvisto seeks a probationary sentence.

**III.**    **A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Sorvisto, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities.  Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP

numbers show that 271 inmates have died from COVID-19.[20]   With the rise of COVID-19

variants, the risks of contracting the virus and death remain a serious concern for inmates.

IV.   **A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Sorvisto.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need

for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to

protect the public from further crimes of the defendant."  The public has been protected while

Mr. Sorvisto has been on pretrial release.  For the last eight (8) months, Mr. Sorvisto has fully

complied with supervision requirements.  The public will be protected while Mr. Sorvisto is

being supervised by the Probation Officer, which will further deter criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who

commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening"

effect and "produce at best a very modest deterrent effect."  *Five Things About Deterrence*, Nat'l

Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).  With respect to specific deterrence, research

shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than

the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very

effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to

deter crime."  *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are

Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016)

(quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not

have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism

---

[20] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).

more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case.

### V.    Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Sorvisto to probation would not contribute to an unwarranted sentencing disparity, but sentencing him to *anything other* than probation, might.  Though the majority of the January 6th cases are unresolved, this Honorable Court can look to other sentencing judgments to gain a baseline.  January 6th defendants in other cases who pled to the *exact* same criminal charge with the *same* minimal criminal history have received probationary sentences. *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months' probation); *United States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation); *United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim. No. 21-cr-0355 (5 years' probation); *United States v. Andrew Wrigley*, Crim. No. 21-cr-42 (18 months' probation).

By contrast, Mr. Dresch, Mr. Sorvisto's companion on the eventful day, received a sentence of 6 months for the same charge, which resulted in a time served sentence.  While the two were together that day in the Capitol, their history and conduct were very different.  Mr. Dresch posted many incendiary comments on social media leading up to, during, and after the event.  *See United States v. Dresch*, Crim. No. 21-cr-71, ECF No. 33, Gov't Sent. Memo, pp. 6-7 ("[Dresch] posted that he was preparing to go to 'DC,' and was 'prepared for chemical attacks and what not.'";  "The next day, on January 7, 2021, at about 9:36 a.m., [Dresch] commented on an unidentified post that 'Mike Pence gave our country to the communist hordes, traitor scum like the rest of them, we have your back give the word and we will be back even stronger.'"). Mr.

Sorvisto did not post such comments.  Mr. Dresch is a convicted felon.  Mr. Sorvisto has no felony convictions.  In sum, both men are very different, thus their punishment should be very different.  Mr. Sorvisto's history and conduct are more similar to the individuals who received probationary sentences.  To sentence him differently than the January 6th defendants who pled to the same offense and have the same criminal histories, would *lead to* an unwarranted sentencing disparity, in stark contrast to the factors dictated in 18 U.S.C. § 3553(a)(6).

## VI.  Mr. Sorvisto's Ability to Pay Restitution is Directly Related to His Ability to Work

Finally, 18 U.S.C. § 3553(a)(7), provides that a Court must account for whether a proposed sentence would impact the ability of the defendant to provide restitution to the victim of the offense.  As part of his plea agreement, Mr. Sorvisto has agreed to pay $500 to the Architect of the Capitol, even though he was not personally responsible for any damage to the building.  Agreeing to that amount of money is a significant commitment for Mr. Sorvisto since his job as a kitchen manager is seasonal.  As a result, the money he earns during the winter months has to last the entire year.  Incarcerating Mr. Sorvisto will result in him missing needed income to provide for his family and will delay when the restitution can be paid.  This will not serve the interests of the victim in this case since according to the government, $1.4 million has already been expended to repair damage done on January 6th.

### Conclusion

Considering the § 3553(a) sentencing factors, a two-year probationary sentence, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

16

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500